## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSHUA D. ROBERSON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-12938** |
| **DARREL VANNOY, WARDEN** | **SECTION: "E"(1)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

## I. State Court Factual and Procedural Background

Petitioner, Joshua A. Roberson, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On October 18, 2011, Roberson was charged by a bill of indictment with second degree murder of Tabitha Ross in violation of La. Rev. Stat. § 14.30.1.[1] After a trial, a jury found petitioner guilty as charged by a verdict of ten to two.[2] The trial court

---

[1] State Rec., Vol. 1 of 8 , Bill of Indictment dated October 18, 2011.

[2] State Rec., Vol. 1 of 8, minute entry dated April 29, 2013; minute entry dated April 30, 2013; minute entry dated May 1, 2013; minute entry dated May 2, 2013; verdict dated May 2, 2013; State Rec., Vol. 2 of 8, trial transcript of April 29, 2013; trial transcript of April 30, 2013; State Rec., Vol. 3 of 8, trial transcript of April 30, 2013 (con't); trial transcript of May 1, 2013; trial transcript of May 2, 2013.

denied petitioner's motion for post verdict judgment of acquittal and motion for new trial.[3]  On July 18, 2013, the trial court sentenced petitioner to life imprisonment without the benefit of probation or suspension of sentence.[4]  The trial court denied petitioner's motion to reconsider his sentence.[5]

On May 2, 2014, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and sentence.[6]  The Louisiana Supreme Court denied writs without stated reasons on January 9, 2015.[7]  Petitioner did not file for a writ of certiorari with the United States Supreme Court.

On May 1, 2014, petitioner filed a motion for new trial based on newly discovered evidence.[8]  He refiled a verbatim copy on February 3, 2015.[9]  At a hearing held on January 18, 2017, petitioner submitted evidence in support of his motion and the trial court held the matter open for the taking of additional evidence.[10]  Petitioner submitted additional evidence on April 4, 2017.[11]  On April 27, 2017, the trial court denied the motion.[12]  The Louisiana First Circuit denied his related writ application on September 5, 2017.[13]  The Louisiana Supreme Court denied relief without reasons.[14]

---

[3] State Rec., Vol. 1 of 8, Motion for Post Verdict Judgment of Acquittal dated May 10, 2013; Motion for New Trial dated May 10, 2013.
[4] State Rec., Vol. 1 of 8, minute entry dated July 18, 2013; State Rec., Vol 3 of 8, sentencing transcript of July 18, 2013.
[5] State Rec., Vol. 1 of 8 , Motion to Reconsider Sentence July 30, 2013; Order dated August 5, 2013.
[6] State v. Roberson, No. 13 KA 2010, 2014 WL 3843863 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 6 of 8.
[7] State v. Roberson, 157 So. 3d 398 (La. 2015); State Rec., Vol. 5 of 6.
[8] State Rec., Vol. 6 of 8, Motion for New Trial Based Upon Newly Discovered Evidence dated May 1, 2014.
[9] State Rec. Vol 6 of 8, Motion for New Trial Based Upon Newly Discovered Evidence dated February 3, 2015.
[10] State Rec. Vol. 6 of 8, hearing transcript of January 18, 2017.
[11] State Rec., Vol. 6 of 8, Reply to State's Response to Motion for New Trial dated April 4, 2017; hearing transcript of April 4, 2017.
[12] State Rec., Vol 6 of 8, Order and Reasons dated April 27, 2017.
[13] State v. Roberson, 17 KW 1018, 2017 WL 3888858 (La. 1st Cir. Sept. 5, 2017); State Rec., Vol. 7 of 8.
[14] State ex rel. Roberson v. State, 256 So.3d 997 (La. 2018); State Rec., Vol. 8 of 8.

On October 13, 2019, petitioner filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief:[15]  (1) the trial court erred in allowing the state to introduce evidence of "other crimes", specifically that petitioner exchanged drugs for two guns; (2) insufficient evidence supported his conviction; (2) the state failed to prove that petitioner had specific intent to kill the victim; and (4) the trial court erred in denying petitioner's motion for new trial.

On November 27, 2019, the state filed its Response to Petition for Habeas Corpus Relief. It concedes that petitioner's petition is timely and his claims are exhausted.[16]  The state argues that petitioner's claims are meritless.

## II. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state courts' decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application

---

[15] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner signed his petition and certificate of service on October 13, 2019.
[16] Rec. Doc. 8.

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state courts' decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1705 (2014). However, the Supreme Court cautioned:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.    AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that*

*there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein. White, 134 S. Ct. at

1701.

### III. Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this

case as follows:

> After 10:00 p.m. on Saturday, August 13, 2011, Usheeka Quinn and her friend, Tabitha Ross, the victim herein, drove to a daiquiri shop in Mandeville. The victim went inside the daiquiri shop, while Usheeka stayed in the vehicle. A short time later, Usheeka went to pick up a friend, Shemeta Marshall, whom she brought to the daiquiri shop. Usheeka stayed in the car. About an hour later, Usheeka saw the victim, the defendant (the victim's former fiance) and Shemeta leave the shop. The victim, who had been dating the defendant on and off for several years, became upset about the defendant talking to Shemeta. Shemeta then went back into the daiquiri shop, and the defendant walked to his car.
> The victim got in Usheeka's car and told her to drive over by the defendant's car. When they approached, the victim asked the defendant if he was okay, and the defendant replied, "Bitch, call Peggy." The defendant then drove away. The victim wanted to follow the defendant to his house, but Usheeka did not want to drive. Thus, after switching places in the car, the victim drove to the defendant's house on Adair Street in Mandeville. She met the defendant in his yard, and they walked inside the defendant's house, while Usheeka waited in the car. About fifteen minutes later, the defendant approached Usheeka and told her that the victim was "good" and that Usheeka could leave. Usheeka then drove back to the daiquiri shop, where she met up with Shemeta. While at the daiquiri shop, Usheeka called and texted the victim, but received no response. Usheeka and Shemeta drove to the

defendant's house, but his car was gone; thus, they again drove back to the daiquiri shop.

That night, Usheeka and her sister, Erica, slept at Shemeta's house. The next morning, Sunday, Usheeka continued to text the victim without reply. At about 7:30 a.m., the defendant stopped by Shemeta's house to see Shemeta's brother, Demond. The defendant and Demond had plans to go to a barbeque that day. When Shemeta asked the defendant about the victim, the defendant told her that he had not seen the victim and did not know her whereabouts. By Sunday afternoon, no one had heard from the victim. Marci Ross, the victim's sister, went to the defendant's house and knocked on the front door, but no one answered. Marci then called the police

Sergeant Paul Bourque, with the city of Mandeville Police Department, arrived at the defendant's house, checked the front door and found it locked. After knocking open the door with his shoulder, he found the victim dead on the floor with a single gunshot wound to the head and her body partially covered with a blue tarp. Dr. Michael Defatta, a pathologist who performed the autopsy, testified that, given the multiple skull fractures and the through-and-through wound to her head, the victim was shot by a powerful handgun or rifle, and that a .22 caliber weapon could not have done that kind of extensive damage.

Sergeant Vincent Liberto, with the Mandeville Police Department, was the lead detective on the case. He testified that about forty people were interviewed, and the only suspect developed was the defendant. The defendant was brought to the police station for questioning. Sergeant Liberto testified that after speaking to the defendant, he learned the location of the murder weapon. The defendant was brought to Sunset Point, where he pointed out where he had thrown the gun. About an hour and fifteen minutes later, a dive team found a .357 magnum handgun in the middle of a lagoon. The chambers were empty. The dive team could not find the cartridges or bullets. The gun was test-fired and was in working condition.

Joseph Crowe, III, who was in jail on pending charges of convicted felon in possession of a firearm, theft, and bank fraud, testified that a few days before the victim was shot, he gave a .357 magnum Smith & Wesson handgun to the defendant in Mandeville in exchange for cocaine. The gun belonged to Crowe's father. On a second occasion, Crowe gave the defendant his father's .22 caliber handgun in exchange for drugs. (According to Crowe, although the defendant got the .22, he never got the drugs).

Peggy Magee testified that in August of 2011, she worked for a bail bonding company and had an outstanding bond for the defendant, for which the victim was a signed surety. The State's theory of the case was that the defendant killed the victim to prevent her from removing herself as a surety for the bond, the removal of which would have resulted in the defendant going back to jail.[17]

---

[17] State v. Roberson, 13-2010, 2014 WL 3843863, at *1-2 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 6 of 8..

## IV.    Petitioner's Claims

## A.  Other Crimes Evidence

Petitioner first claims that the trial court erred in allowing the state to introduce evidence that he had exchanged drugs for two guns.  Petitioner claims that the evidence did not meet the exception provided in La. Code. Evid. art. 404(B).

The Louisiana First Circuit, in addressing petitioner's claim on direct appeal, explained as follows:

> In his first assignment of error, the defendant argues the trial court abused its discretion in allowing into evidence at trial other crimes of the defendant. Specifically, the defendant contends that the testimony of Joseph Crowe, III about trading the guns for drugs had no probative value, but served only to inform the jury that the defendant was involved with drugs and criminal activity.
>
> Prior to Crowe taking the stand, one of the defense attorneys reurged her objection to the State's LSA–C.E. art. 404(B) notice of intent to introduce other crimes evidence.  Defense counsel argued that because the guns were offered to the defendant, rather than sought out by him, the exchange for drugs did not show preparation, intent, motive, or any other permissible purpose; thus, if there was any probative value to the evidence, it would be grossly outweighed by any prejudicial effects.  The prosecutor responded that he believed the evidence did show plan, preparation, and intent and, further, that the defendant's acquiring the guns was part of the *res gestae*.  The trial court agreed that it was res gestae and overruled the art. 404(B) objection.
>
> Louisiana Code of Evidence article 404(B)(1) provides:
>
> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
>
> Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant.  In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a person of criminal character,

other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition.  State v. Lockett, 99–0917 (La. App. 1st Cir. 2/18/00), 754 So.2d 1128, 1130, writ denied, 2000–1261 (La. 3/9/01), 786 So.2d 115.  The trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.  See State v. Galliano, 2002–2849 (La.1/10/03), 839 So.2d 932, 934 (per curiam).

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  LSA–C.E. art. 401.  All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible.  LSA–C.E. art. 402.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. LSA–C.E. art. 403.

The sale of the guns to the defendant, particularly the .357 magnum, had independent relevance and was admissible under LSA–C.E. art. 404(B)(1) to identify the defendant as the assailant.  In his opening statement, defense counsel raised the issue of the identity of the shooter by stating that someone who had a "bone to pick" with the defendant was in the house and shot the victim.  Counsel further stated that the recovered guns were "not linked to" the defendant, and, instead, were "linked to Joseph Crowe."  Thus, the defense's hypothesis of innocence was that someone else shot the victim.  Proof of the defendant's acquisition of the .357 magnum, which the defendant threw in the lagoon after the crime, was relevant to show that he owned a large caliber handgun that could have caused the victim's wound.  Crowe's testimony contradicted the defense's hypothesis of innocence by directly linking the defendant to the recovered .357 magnum.

Moreover, the evidence at issue constituted "*res gestae*" or integral act evidence.  Under LSA–C.E. art. 404(B)(1), evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as *res gestae*, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding."  *Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them.  A close proximity in time and location is required between the charged offense and the other crimes evidence to ensure that the purpose served by admission of other crimes evidence is not to depict defendant as a bad person, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.  State v. Colomb, 98–2813 (La. 10/1/99), 747 So.2d 1074, 1076 (per curiam).  The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances.  State v. Taylor, 2001–1638 (La. 1/14/03), 838 So.2d 729, 741, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).

The evidence established that just days before the killing, the defendant obtained two guns in exchange for drugs. Crowe testified that he gave the defendant his father's .357 magnum handgun in exchange for cocaine. Shortly thereafter, Crowe gave the defendant his father's .22 caliber handgun for more drugs. Sergeant Liberto testified that after speaking to the defendant, he learned that the defendant had thrown the murder weapon into a lagoon at Sunset Point. The defendant was taken to the lagoon, where he pointed out the spot where he threw the gun. Within about an hour and fifteen minutes, a dive team retrieved a .357 magnum handgun from the water, Crowe was shown this handgun at trial, and testified that that gun was the one he had sold to the defendant.

Dr. Defatta testified at trial that the through-and-through wound to the victim's head was so complete and extensive that a smaller caliber handgun, such as a .22, could not have caused that wound; rather, the wound was caused by a high-caliber weapon, such as a .357 magnum, or a 9mm or .38 caliber weapons with Plus–P rounds, which are very powerful rounds.

The prosecutor was entitled to present a case with narrative momentum and cohesiveness. See Colomb, 747 So.2d at 1076. Accordingly, the gun sales to the defendant, particularly the .357 magnum, constituted "integral part of the act" evidence, which was highly relevant in establishing how the defendant came into possession of the gun he used to kill the victim and then threw it into the lagoon.

This assignment of error is without merit.[18]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[19] See Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The state opines that the United States Supreme Court has never held that the admission of "other crimes" evidence can serve as the basis for a due process violation. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (holding that when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law" (quotation marks and brackets omitted) ). That point is well taken. See, e.g., Wallace v. Deville, No. 17-407, 2017 WL 2199024,

---

[18] Roberson, 2014 WL 3843863, at *2-4 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 6 of 8..
[19] Roberson, 157 So. 3d at 398; State Rec., Vol. 5 of 6.

at *16 (E.D. La. Apr. 26, 2017) ("Absent controlling Supreme Court precedent on the issue [of whether the admission of prior crimes evidence violates due process], the state courts' determination cannot be said to be contrary to, or an unreasonable application of, clearly established federal law."), <u>adopted</u>, 2017 WL 2198957 (E.D. La. May 18, 2017).

Second, petitioner's claim also fails under the normal due process analysis applied to evidentiary claims. The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." <u>Little v. Johnson</u>, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law, his claim simply is not reviewable in this federal proceeding. <u>See, e.g.</u>, <u>Pettus v. Cain</u>, Civ. Action No. 14-1685, 2015 WL 1897711, at *7 (E.D. La. Apr. 27, 2015).

To the extent that petitioner is asserting a federal claim, he fares no better. Even if petitioner could show that the evidence was in fact improperly admitted, which is questionable for the reasons explained by the Louisiana First Circuit Court of Appeal, federal habeas relief still would not be warranted. The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

<u>Neal v. Cain</u>, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); <u>accord</u> <u>Little</u>, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted."). Under these standards, to establish a fundamentally unfair trial, a petitioner must show a reasonable probability that the verdict would

have been different had the trial been properly conducted.  Kirkpatrick v. Blackburn, 777 F.2d 272, 279 (5th Cir. 1985).

Here, it simply cannot be said that the evidence of petitioner's prior crimes played a crucial, critical, and highly significant role in his instant conviction.  As an initial matter, it must be noted that the jurors were carefully instructed by the court regarding the limited purposes for which the "other crimes" evidence could be considered,[20] and courts have repeatedly noted that jurors are presumed to follow their instructions.  See, e.g., Jones v. United States, 527 U.S. 373, 394 (1999); United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1349 (5th Cir. 1994).  Further, and more importantly, it must be remembered that (1) petitioner was the last person to be seen with the victim and told Usheeka Quinn to leave; (2) petitioner denied knowing the whereabouts of the victim the following day, and was untruthful when he told Ross that "Terri" had picked up the victim; (3) the victim was found dead in petitioner's house; (4) petitioner led the police to the lagoon where he threw a .357 magnum, which was consistent with the murder weapon, in the water and the weapon was recovered; (5) the victim's blood was on petitioner's socks, belt, and shorts he was wearing at the time of his arrest as well as a pair of his shorts found before the couch in the front room of his house.  Obviously, that compelling evidence was alone sufficient to prove his guilt even without the "other crimes" evidence.

For all of these reasons, this claim should be denied.

### B and C.  Sufficiency of the Evidence/Intent

Petitioner's second and third claims are that there was insufficient evidence to prove that he was in fact guilty of the crime of which he stands convicted.  He contends that the state failed to prove that he had specific intent to kill the victim.  He claims a reasonable hypothesis of innocence

---

[20] State Rec., Vol. 3 of 6, trial transcript of May 2, 2013, p.548

is that he accidentally killed the victim as he had been drinking heavily and that the gun went off

accidentally when he was showing it to her.  He alternatively argues that he established provocation

and heat of passion sufficient for a verdict of manslaughter.  The applicable legal standard,

however, requires that this Court consider whether the evidence was sufficient to prove second

degree murder, which was the verdict in his case.

On direct appeal, the Louisiana First Circuit Court of Appeal denied his claim relating to

the sufficiency of the evidence holding:

> In his second assignment of error, the defendant argues the evidence was insufficient to support the conviction for second degree murder.  Specifically, the defendant contends the State did not prove he had the specific intent to kill the victim; in the alternative, if specific intent was proven, the defendant contends he is guilty of manslaughter because of the presence of the mitigating factors of sudden passion or heat of blood at the time of the killing.
>
> A conviction based on insufficient evidence cannot stand as it violates Due Process.  See U.S. Const. amend. XIV; La. Const. art. I, § 2.  The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  See LSA–C.Cr.P. art. 821(B); State v. Ordodi, 2006–0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308–09 (La. 1988).  The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  Pursuant to LSA–R.S. 15:438, when analyzing circumstantial evidence, the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence.  See State v. Patorno, 2001–2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
>
> Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  LSA–R.S. 14:30.1(A)(1). "Guilty of manslaughter" is a proper responsive verdict for a charge of second degree murder.  LSA–C.Cr.P. art. 814(A)(3).  Louisiana Revised Statute 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the fact finder finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.  The existence of "sudden passion" and "heat of blood" are not elements of the offense, but, rather, are factors in the nature of mitigating

circumstances that may reduce the grade of homicide.  State v. Maddox, 522 So.2d 579, 582 (La. App. 1st Cir.1988).  Manslaughter requires the presence of specific intent to kill or inflict great bodily harm.  See State v. Hilburn, 512 So.2d 497, 504 (La. App. 1st Cir.), writ denied, 515 So.2d 444 (La.1987).

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.  LSA–R.S. 14:10(1).  Such state of mind can be formed in an instant.  State v. Cousan, 94–2503 (La.11/25/96), 684 So.2d 382, 390.  Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant.  State v. Graham, 420 So.2d 1126, 1127 (La. 1982).  Deliberately pointing and firing a deadly weapon at close range are circumstances that support a finding of specific intent to kill.  State v. Broaden, 99–2124 (La. 2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001).  The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact.  State v. McCue, 484 So.2d 889, 892 (La. App. 1st Cir.1986).

Negligent homicide is the killing of a human being by criminal negligence.  LSA–R.S. 14:32(A)(1).  Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.  LSA–R.S. 14:12.

In his brief, the defendant does not deny shooting the victim.  Instead, he argues that he did not have the specific intent to kill her.  Specifically, he asserts that a reasonable hypothesis of innocence is that he accidentally shot the victim because he had been drinking heavily.  The defendant argues in the alternative that if he did have specific intent, the evidence was sufficient to support a conviction only for manslaughter.  Specifically, the defendant asserts the second degree murder was based on insufficient evidence "because he established provocation and heat of passion sufficient for manslaughter."

The jury could have reasonably concluded the defendant did not kill the victim accidentally, but had the specific intent to kill her.  According to Dr. Defatta, the defendant fired his gun at the victim's head from a range no closer than thirty-six to forty-three inches away.  The bullet traveled completely through her head, defining a path that was virtually parallel to the ground.  This trajectory suggested that the victim was standing when she was shot and that the defendant was holding the gun straight, or parallel to the ground, as he fired at her head.  Moreover, the defendant's actions following the shooting were consistent with a finding of specific intent to kill, as he rendered no aid and fled from the scene.  See State v. Lutcher, 96–2378 (La. App. 1st Cir.9/19/97), 700 So.2d 961, 973, writ denied, 97–2537 (La. 2/6/98), 709 So.2d 731.  After the defendant shot the victim, he did not call the police or seek help.  Instead he covered the victim's body with a tarp and left her body in his house, where he locked the front door.  He then threw the .357 magnum that he used to kill her into a lagoon and later lied to the victim's sister about not having seen her.  See State v. Huls, 95–0541 (La. App. 1st Cir.5/29/96), 676 So.2d 160, 177, writ denied, 96–1734 (La. 1/6/97), 685 So.2d 126.

Accordingly, the defendant's specific intent to kill could have been inferred from his actions.

The remaining issue, thus, is whether the victim's killing constituted manslaughter instead of second degree murder. It is the defendant's burden to establish by a preponderance of the evidence the mitigating factors of sudden passion or heat of blood to reduce a homicide to manslaughter. See State ex rel. Lawrence v. Smith, 571 So.2d 133, 136 (La.1990); State v. LeBoeuf, 2006–0153 (La. App. 1st Cir.9/15/06), 943 So.2d 1134, 1138, writ denied, 2006–2621 (La. 8/15/07), 961 So.2d 1158. See also Patterson v. New York, 432 U.S. 197, 208–211, 97 S.Ct. 2319, 2326–2327, 53 L.Ed.2d 281 (1977). Further, the killing committed in sudden passion or heat of blood must be immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Thus, the evidence at trial had to establish that the provocation was such that it would have deprived an average person of his self-control and cool reflection.

There was no testimony or physical evidence that the victim physically provoked the defendant in any way. The defendant did not testify at trial, and there were no witnesses for the defense. Thus, the defense did not establish the mitigating factors of sudden passion or heat of blood during the night of the shooting. In his brief, the defendant suggests that he and the victim had recently broken off their engagement and that they had an argument in the daiquiri shop parking lot. At that time, the defendant "was very angry and upset when he left to go home." A reasonable hypothesis of innocence, according to the defendant, is that he became even angrier when the victim followed him home and that she may have threatened at that point to remove her name as surety, which sufficiently provoked the defendant and deprived him of his self-control and cool reflection. We reject these assertions as meritless.

The evidence established that in the parking lot, the defendant and the victim very briefly exchanged words. According to Usheeka, she drove by the defendant in the parking lot so that the victim, who was a passenger in Usheeka's car, could see how the defendant was doing. When the victim asked the defendant if he was "okay," the defendant replied, "Bitch, call Peggy," and drove away. Shortly thereafter, the victim drove Usheeka's car to the defendant's house. Usheeka was the front-seat passenger. The defendant was walking from his aunt's house (next door to his house) across his front yard to his house. The victim met the defendant in the yard, and they walked together inside the defendant's house. Usheeka waited in her car. About fifteen minutes later, the defendant approached Usheeka and told her that the victim was "good," and that she could "roll out." According to Usheeka, when the defendant told her that she could leave, the defendant did not seem angry or upset.

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See State v. Moten, 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La.1987). It is clear from the guilty verdict that the jury rejected the theory that the defendant was so angry when he shot the victim that he was deprived of his self-control and cool reflection. Moreover, even if the victim

did threaten to remove her name as surety, which caused the defendant to become so angry that he killed her, he would still be guilty of second degree murder. Questions of provocation and time for cooling are for the jury to determine under the standard of the average or ordinary person with ordinary self-control. If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. State v. Leger, 2005–0011 (La. 7/10/06), 936 So.2d 108, 171, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). Mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter. State v. Mitchell, 39,202 (La. App. 2nd Cir.12/15/04), 889 So.2d 1257, 1263, writ denied, 2005–0132 (La. 4/29/05), 901 So.2d 1063. See State v. Charles, 2000–1611 (La. App. 3rd Cir.5/9/01), 787 So.2d 516, 519, writ denied, 2001–1554 (La.4/19/02), 813 So.2d 420 (an argument alone will not be sufficient provocation to reduce a murder charge to manslaughter). See also State v. Tran, 98–2812 (La. App. 1st Cir .11/5/99), 743 So.2d 1275, 1292, writ denied, 99–3380 (La.5/26/00), 762 So.2d 1101.

The jury heard the testimony and viewed the evidence presented to it at trial and found the defendant guilty as charged. The defendant did not testify. See Moten, 510 So.2d at 61–62. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003–1980 (La.4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Moreover, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor, 97–2261 (La. App. 1st Cir.9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99–3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir.1985). The guilty verdict indicates the reasonable determination by the jury that, for whatever reason the defendant had, he shot the victim in the head with the specific intent to kill her and in the absence of the mitigating factors of manslaughter. See State v. Delco, 2006–0504 (La. App. 1st Cir.9/15/06), 943 So.2d 1143, 1149–51, writ denied, 2006–2636 (La. 8/15/07), 961 So.2d 1160.

After a thorough review of the record, we find that the evidence supports the jury's guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the second degree murder of Tabitha Ross. See State v. Calloway, 2007–2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

This assignment of error is without merit.[21]

---

[21] Roberson, 2014 WL 38434863, * 4-7 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 6 of 8.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[22]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state courts' decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, petitioner has not made such a showing.

As the Louisiana First Circuit recognized, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' " Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added). Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state

---

[22] Roberson, 157 So. 3d at 398; State Rec., Vol. 5 of 8.

prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted). Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Additionally, it must be remembered, contrary to petitioner's argument, that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Petitioner was charged with and convicted of second degree murder.  Under Louisiana law, second degree murder is defined as "the killing of a human being ... when the offender has a specific intent to kill or to inflict great bodily harm."  La. Rev. Stat. § 14:30.1(A).  The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. § 14:10(1).  Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the accused and the circumstances surrounding those actions.  State v. Tate, 851 So. 2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So. 2d 714, 717 (La. 1987)); State v. Sharlhorne, 554 So. 2d 1317, 1321 (La. App. 1st Cir. 1989).  Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun.  State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing State v. Brunet, 674 So.2d 344, 349 (La. 1996)).

Initially, in opening statement, the defense claimed that someone else shot the victim as she and petitioner walked into his home and suggested Joseph Crowe as a possible suspect.[23] Petitioner has since abandoned that argument and, as stated above, does not contest that he killed the victim.  Instead, he argues the state failed to show his specific intent to kill her or cause great bodily harm.  That contention has no merit.

According to the evidence at trial, Usheeka Quinn was the last person to see the victim alive when she accompanied her to petitioner's house and watched petitioner and the victim enter the house together.[24]  Quinn did not see anyone else there.[25]  Quinn waited in the car about ten to fifteen minutes before petitioner came out and knocked on the window.[26]  He told Quinn, "She's

---

[23] State Rec., Vol. 2 of 8, trial transcript of Aril 30, 2013, pp. 248-253.
[24] Id., at pp. 270-271.
[25] Id., at p. 277.
[26] Id., at p. 271.

good, roll out."[27]  Quinn returned to the daiquiri shop, but called the victim shortly thereafter and reached her voicemail.[28]  She and Shemeta Marshall returned to the house, but petitioner's car was gone.[29]

Ronald Palmer testified that in the early morning hours of August 14, 2011, he saw a car drive back behind the Goodyear, where petitioner's house was located, and then leave a little later.[30]  Not long after the car left, at 1:18 a.m., he heard a gunshot.[31]  He did not see anyone leave the area after the gunshot.[32]

The next witness to see petitioner was Marshall when he arrived at her house about 7:30 a.m. on Sunday August 14, 2011, approximately 6 hours later.[33]  Marshall observed someone in petitioner's car, whom she assumed was the victim, and asked petitioner to have her get out of the car.[34]  Petitioner told Marshall the person in the car was not the victim and that he did not know of the victim's whereabouts.[35]

Marci Ross testified that she spoke to petitioner on Sunday afternoon, and he claimed not to have seen the victim.[36]  When she confronted him with the fact that the victim had been dropped off at his home earlier that morning, petitioner told her that the victim's friend "Terri" had picked her up.[37]  Ross knew that claim was untrue because Terri had been with Ross's brother that night, so she called the police.[38]

[27] Id.
[28] Id., at pp. 272, 284.
[29] Id., at pp. 273, 285.
[30] State Rec., Vol. 3 of 8, trial transcript of April 30, 2013 (con't), pp. 326-327.
[31] Id., at p. 331.
[32] Id., at p. 327.
[33] State Rec., Vol. 2 of 8, trial transcript of April 30, 2013, pp. 285.
[34] Id., at pp. 286-87.
[35] Id.
[36] Id.
[37] Id.
[38] Id.

Sergeant Paul Bourque testified that he responded to a call at 707 Adair Street where he met Marci Ross.[39]  Ross was concerned about her inability to contact the victim and was concerned she may have been killed inside the residence.[40]  Bourque shouldered the door, which was locked, open and found the victim deceased on the floor partially covered by a blue tarp.[41]  He explained that he walked through the residence and that some of the footprints in crime scene photographs were made by his boots.[42]  A crowd had formed outside the home and petitioner was developed as a suspect.[43]

Sergeant Vincent Liberto responded to the scene at 707 Adair Street on August 14, 2011, observed the victim's body, and was advised that a possible suspect was in custody.[44]  After speaking with Liberto, petitioner accompanied Liberto and the St. Tammany Parish Sheriff's Office Dive Team to a lagoon at Sunset Point where petitioner indicated that he had thrown the weapon used in incident, and the dive team located the weapon.[45]  The weapon was unloaded when found, but information led police to believe that the weapon was emptied and the rounds were thrown into the lagoon.[46]  Liberto testified, without objection, that petitioner indicated the weapon found in the lagoon was the murder weapon.[47]  Liberto testified that based on the blood patterns in petitioner's home, he believed that the door to the house was open when the victim was shot, that the bullet went through the doorway outside into the woods, and that the victim's body was moved after so the door could be closed.[48]  They located a pair of blue jean shorts within 10 to 15

---

[39] Id., at pp. 296-97.
[40] Id., at p. 297.
[41] Id., at pp. 297, 302.
[42] Id., at pp. 299, 304.
[43] Id., at pp. 300, 302-303.
[44] State Rec., Vol. 3 of 8, trial transcript of April 30, 2103 (con't), p. 366.
[45] Id., at pp. 367-69, 371.
[46] Id., at p. 371.
[47] Id., at p. 384.
[48] Id., at pp. 372-74, 393-94.

feet of the victim.[49] They collected petitioner's clothes he was wearing at the time of his arrest, which had blood on them.[50]  The key to petitioner's house was in the pocket of the shorts he was wearing.[51]  Liberto testified approximately 25 people were interviewed during the investigation and that no suspect was identified other than petitioner.[52]

Sergeant Brett Hardaker of the St. Tammany Parish Sheriff's Office testified that he was part of the dive team and found the firearm after the petitioner was brought to the scene and indicated the area to search.[53]  He identified the firearm in court.[54]  He admitted that they did not find any bullets or casings.[55]

Dr. Michael DeFatta, a forensic pathologist for St. Tammany Parish Coroner's Office, conducted the autopsy on the victim.[56]  The victim had a gunshot wound just over her left ear that traveled through her left temporal bone, through the brain, and exited the right parietal lobe of the brain with a larger exit wound than an entrance wound.[57]  Dr. DeFatta testified within a reasonable degree of medical certainty that the range of fire was no closer than 36 to 43 inches.[58]  He explained that the entry and exit were perpendicular meaning that plane of the muzzle of the firearm would be 90 degrees to the surface of the skull.[59]  He further explained that there was a straight pathway of the bullet through the brain and skull indicating that, regardless of the victim's position, the

---

[49] Id., at p. 375, 386, 401.
[50] Id., at pp. 377-78.
[51] Id., at pp. 381-82.
[52] Id., at pp. 383, 401.
[53] Id., at pp. 418-419.
[54] Id., at p. 420.
[55] Id., at p. 421.
[56] State Rec., Vol. 2 of 8, trial transcript of April 30, 2013, p. 309.
[57] Id., at p. 310.
[58] Id., at p. 312.
[59] Id., at p. 316.

muzzle of the firearm was pointed straight at the victim's skull.[60]  The cause of death was homicide

due to a gunshot wound to the head with just a few seconds of survival.[61]

Joel Maier a gunshot residue analyst at the St. Tammany Crime Lab testified that gunshot

residue particles are extremely small and that water or bleach could get rid of them.[62]  He testified

that only one gunshot residue particle was found on petitioner and one on the victim, meaning the

testing was inconclusive because they require a threshold of four gunshot residue particles on a

person or their clothes to call it a positive test.[63]

Tara Brown, a forensic DNA analyst for the St. Tammany Parish Coroner's Office, testified

that a DNA analysis determined that the victim's blood was on petitioner's sock, shorts, and belt,

but that both Crowe and petitioner's DNA profile were excluded as donors of the stain on the

sock.[64]  Petitioner could not be excluded as a minor donor as to several of the blood stains on the

shorts and belt.[65]  Brown tested the second pair of shorts and determined that petitioner was the

wearer of the shorts and that the victim's blood was on them.[66]

The foregoing evidence was clearly constitutionally sufficient to support a conviction of

second degree murder.  "Deliberately pointing and firing a deadly weapon at close range are

circumstances which will support a finding of specific intent to kill."  State v. Bland, 194 So. 3d.

679, 686 (La. App. 1st Cir. 2016) (citations omitted).  Dr. DeFatta's testimony about the distance

from which the weapon was fired, the straight trajectory the bullet traveled, and the severity of the

injuries to the victim, support a reasonable finding beyond a reasonable doubt that petitioner had

specific intent to kill or inflict great bodily harm on the victim.  Further, petitioner's action

---

[60] State Rec. Vol. 3 of 8, trial transcript of April 30, 2013 (con't), p. 323.
[61] State Rec., Vol. 2 of 8, trial transcript of April 30, 2013, p. 317.
[62] State Rec., Vol. 3 of 8, trial transcript of May 1, 2013, pp. 461, 465-66.
[63] Id., at pp. 463, 467, 468.
[64] Id., at p. 472.
[65] Id., at pp. 474-476.
[66] Id., at pp. 477-480.

thereafter also support a finding of second degree murder.  His failure to seek assistance for the victim and his flight from the scene indicate consciousness of guilt and are circumstances under which a factfinder may infer guilt.  State v. Rawson, No 2017 KA 0430, 2017 WL 4082433, at *6 (La. Ap. 1st Cir. Sept. 15, 2017).  Additionally, petitioner apparently admitted to shooting the victim and led the police to the location where he disposed of the weapon.

Petitioner claims his intoxication precluded a finding of specific intent.  Under Louisiana law, intoxication is a defense to a prosecution for second degree murder if the circumstances indicate the intoxication, whether voluntary or involuntary, precludes the presence of specific criminal intent.  La. Rev. Stat. § 14:15(2).  When defenses that could defeat an essential element of an offense, such as intoxication, are raised by the evidence, the state must overcome the defense by evidence that proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication.

While there was evidence that petitioner had been drinking prior to the incident[67], the jury apparently chose to conclude that his consumption of alcohol did not impair his intent.  There was more than sufficient evidence to support a finding that petitioner's actions after the shooting were indicative of his immediate knowledge that he had committed a crime.  It is uncontested that petitioner did not call 911 or seek any other help for the victim after the shooting.  Petitioner had sufficient awareness of what he had done to attempt to clean up the scene of the crime and dispose of key evidence of his crime by throwing the murder weapon into a lagoon.  Similar evidence has been found to show the requisite specific intent despite the consumption of alcohol.  Trosclair v. Cain, Civ. Action No. 12-2958, 2014 WL 4374314, at *8 (E.D. La. Sept. 2, 2014) (Viewing the evidence in the light most favorable to the prosecution, the Louisiana First Circuit concluded that

---

[67] State Rec. Vol. 2 of 8, trial transcript of April 30, 2013, pp. 280-282, 288 (Shemeta Marshall).

a rational trier of fact could conclude that Trosclair had the requisite specific intent, despite his consumption of pills and alcohol), certificate of appealability denied, 14-31093 (5th Cir. Apr. 3, 2015).  Further, hours after the shooting, petitioner was with another woman, and he lied to multiple people about the whereabouts of the victim.  Upon his arrest, he admitted to police that he disposed of the gun, throwing it into a lagoon, and showed them where he had thrown it.

Lastly, to the extent that petitioner is contending that the evidence supported a conviction of only manslaughter, that contention is not supported by the record.  It is true that Louisiana law provides that a defendant who would otherwise be guilty of second degree murder can be found guilty of manslaughter if "the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."  La. Rev. Stat. § 14:31(A)(1).  However, "sudden passion" and "heat of blood" are mitigatory factors.  The state does not bear the burden to disprove the mitigatory factors, rather, the defendant bears the burden to prove that they existed by a preponderance of the evidence.  See, e.g., Trosclair, 2014 WL 4374314, at *9 ("A defendant has the burden of proving these mitigating factors.  Thus, ... the issue to be resolved is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence." (quotation marks omitted) ); State v. Arias-Chavarria, 49 So.3d 426, 431-32 (La. App. 5th Cir. 2010).  Petitioner, who did not testify and did not present any defense witnesses, introduced no evidence whatsoever proving that he acted with "sudden passion" or "heat of blood."  While the evidence established that petitioner and the victim fought in the parking lot of a daiquiri shop, Quinn testified that when she left the victim at petitioner's house neither the victim nor petitioner was upset.[68]  In fact, Quinn recalled that, after

---

[68] State Rec., Vol. 2 of 8, trial transcript of April 30, 2013, pp. 269, 272.

waiting ten or fifteen minutes, petitioner came out and told Quinn, "She's good, roll out", and he did not appear angry, nervous or panicked, but rather acted normally.[69]   Absolutely no evidence was presented to support petitioner's argument that he "became angrier when Tabitha followed him to his house [and] [s]he may have threatened at that point to remove her name as surety provoking him sufficiently to deprive him of self-control and cool reflection."[70]   In any event, "[m]ere words or gestures, however offensive or insulting, will not reduce a homicide from murder to manslaughter." State v. Thompson, 259 So. 3d 1257, 1267 (La. App. 5th Cir. 2018) (citations omitted), writ denied, 278 So.3d 372 (La. 2019).

Therefore, obviously, a rational trier of fact could have found that the mitigatory factors were not established by any evidence, much less the required preponderance of the evidence.   In light of that fact, as well as the fact that the evidence was clearly constitutionally sufficient to support a conviction of second degree murder for the reasons already explained, this contention fails. See, e.g., Madrid v. Cain, Civ. Action No. 15-965, 2016 WL 6304686, at *12 (E.D. La. June 6, 2016), adopted, 2016 WL 6276848 (E.D. La. Oct. 27, 2010), certificate of appealability denied, Madrid v. Vannoy, No. 16-31222m 2018 WL 3968203 (5th Cir. Apr. 5, 2018), cert. denied, 139 S.Ct. 38 (2018).

In summary, for the reasons explained by the Louisiana First Circuit Court of Appeal, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.   Therefore, petitioner cannot show that the state courts' decision rejecting his claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[69] Id., p. 272.
[70] Rec. Doc. 1-1, p. 21.

Accordingly, under these doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

### C.  Motion for New Trial

In his last assignment of error, petitioner claims that the trial court erred in denying his motion for new trial based on newly discovered evidence.[71]   Petitioner presents no facts or argument in support of his claim in his habeas petition.

Petitioner, through counsel, raised this issue in two identical motions for new trial based on newly discovered evidence pursuant to La. Code Crim. P. art. 851(B)(3).[72]  Petitioner claimed that, while his counsel was in possession prior to trial of a recording of an interrogation of Usheeka Ross by the Mandeville Police Department, counsel was unable to decipher the "off camera" recording wherein Ross stated that she heard a gunshot while she was sitting in her car, which was contrary to her "on camera" statement that she did not hear any gunshots when she dropped Ross off at petitioner's house.[73]   In the reply to the state's response, petitioner argued that the newly discovered evidence constituted Brady material and that the state did not include Ross's second statement in the police report.[74]  Two hearings regarding the matter were held by the trial court.[75]

The trial court, in denying the motion, explained as follows:

> The Court finds that defendant counsel had access to the CD containing Usheeka Ross's statement prior to trial.  Even assuming that defense counsel could not decipher Ms. Ross's subsequent statement due to ineffective audio equipment, the Court finds that while the testimony may have contradicted a portion of the trial testimony of Ms. Ross, it is questionable that such testimony would have aided the defense and impeached Usheeka Ross's testimony.  The victim was found deceased at the home of the defendant and the Defendant directed law enforcement to a lagoon where the weapon was found.  The evidence showed that clothes owned by

---

[71] Rec. Doc. 1-1, p. 9.

[72] State Rec. Vol. 6 of 8, Motion for New Trial based on Newly Discovered Evidence dated May 1, 2014; Motion for New Trial based on Newly Discovered Evidence dated February 3, 2015.

[73] Id.; State Rec. Vol. 6 of 8, Motion for New Trial based on Newly Discovered Evidence dated February 3, 2015.

[74] State Rec. Vol. 6 of 8, State's Response to Defendant's Motion for New Trial based upon Newly-Discovered Evidence dated March 7, 2017; Reply to State's Response to motion for New Trial dated April 4, 2017.l

[75] State Rec. Vol. 6 of 8, hearing transcript of January 18, 2017; hearing transcript of April 4, 2017.

the Defendant were stained with the victim's blood. The testimony further established that the Defendant was in the presence of the victim yet denied any knowledge of the victim's whereabouts to the victim's family and friends on the day after her death. Defendant has failed to show that the evidence is of such a nature that, had it been introduced at trial, it would probably have changed the verdict of guilty.[76]

Both the Louisiana First Circuit and the Louisiana Supreme Court denied writs without reasons.[77]

Any argument based on alleged error by the state trial court under state law does not involve consideration of any questions of federal or constitutional law, and review of such claims is not proper on habeas review. Haygood v. Quarterman, 239 F. App'x 39, 42 (5th Cir. 2007) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right) (citing Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) (petitioner's claim that the state courts violated state law in denying his motion for new trial provided no basis for federal habeas relief absent the showing of an independent violation of a federal constitutional right)). Federal habeas corpus review instead is limited to questions of federal constitutional dimension, and federal courts do not review alleged errors in the application of state law. A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Molo v. Johnson, 207 F.3d 773, 776 n. 9 (5th Cir. 2000) ("Federal habeas review does not extend

---

[76] State Rec., Vol 6 of 8, Order and Reasons dated April 27, 2017.
[77] State v. Roberson, 17 KW 1018, 2017 WL 3888858 (La. 1st Cir. Sept. 5, 2017); State Rec., Vol. 7 of 8; State ex rel. Roberson v. State, 256 So.3d 997 (La. 2018); State Rec., Vol. 8 of 8.

to state court conclusions of state law."). Any alleged impropriety based on state law does not warrant federal habeas review or relief.

Of course, pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, it is a federal constitution violation for a prosecutor to suppress material evidence favorable to the defense. However, for the following reasons, it is evident that there was no such violation in this case.

To prevail on a Brady claim, a petitioner must establish three elements: "(1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002). Petitioner's Brady claim falters on the very first prong of that analysis. It is uncontested that the state provided a disc including the interviews of both Ross and Erika Demby. While petitioner contends that his counsel was unable to decipher a statement made by Ross off camera, after Demby's interview, due to the equipment available, "Brady and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." United States v. Pelullo, 399 F.3d 197, 212 (3rd Cir. 2005) (citations omitted).

Furthermore, for all the reasons explained by the trial court, it is questionable whether the statement by Ross that she heard a gunshot while she was waiting outside of petitioner's house was favorable to the accused. Given that the victim was found dead in petitioner's home, he was the last person to be seen with her, her blood was on her clothing, he denied knowing her whereabouts the following day, and he showed the police where he disposed the weapon, Ross's statement that she heard a gunshot likely would have been more incriminating than favorable to petitioner.

For all of these reasons, petitioner's claim should be denied.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Joshua D. Roberson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  13th  day of August, 2020.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**